J-S04001-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF I.N., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.N., FATHER, | |
| Appellant | No. 1454 MDA 2014 |

Appeal from the Order Entered July 31, 2014
In the Court of Common Pleas of Northumberland County
Orphans' Court at No(s): 15 of 2014

BEFORE:  BOWES, ALLEN, and STRASSBURGER,[*] JJ.

MEMORANDUM BY BOWES, J.:                **FILED FEBRUARY 27, 2015**

B.N. ("Father") appeals from the orphans' court order terminating his parental rights to his minor child, I.N.  We affirm.

I.N. was born during February 2004, of Father's marriage to V.N. ("Mother").[1]  Prior to the pertinent events that occurred in Northumberland County, Father was charged criminally in Union County with sexually assaulting two of I.N.'s three half-sisters.  However, those charges were withdrawn after the children recanted the allegations and Father temporarily moved from the family residence.  Northumberland County Children and Youth Services first became involved with this family during 2011 based

_____

[*]  Retired Senior Judge assigned to the Superior Court.

[1] Mother relinquished her parental rights to I.N.

upon additional allegations that Father sexually assaulted one of the children involved in the earlier case.[2]  Although those allegations were also withdrawn and marked unfounded, CYS temporarily removed I.N. and his three half-sisters from the family residence.

Two years later, during May of 2013, the same child, then sixteen years old, asserted new allegations of abuse against Father.  While Father continued to deny the allegations, he was charged with statutory sexual assault and related offenses.[3]  He was arrested the following October and remains incarcerated in the Northumberland County Prison pending his trial.  Following CYS's investigation, the child protective service ("CPS") report was marked "indicated," meaning that substantial evidence existed to satisfy the definition of sexual abuse under the Child Protective Services Law and that Father was the indicated perpetrator of abuse.

Meanwhile, in November 2012, prior to Father's incarceration, the family had executed a child safety plan that, *inter alia*, again precluded

---

[2] During July 2011, there was an intervening allegation that Mother, Father, and Mother's adult son engaged in drug use in the family home.  The ensuing drug screen revealed that all three adults tested positively for cocaine and marijuana.

[3] The orphans' court's review of the criminal docket revealed the following charges: statutory sexual assault, aggravated indecent assault, corruption of minors, and indecent assault of a person less than sixteen.  The offenses include two second-degree felonies, a third-degree felony, and a second-degree misdemeanor.

Father from residing in the family home and determined that Mother was unsuitable to supervise Father's contact with I.N. and his half-sisters.

The current chapter of CYS's involvement stemmed from a January 15, 2013 general protective services referral that was issued after Father violated the safety plan by having unsupervised contact with the children in the family home. I.N. was removed from the home pursuant to a voluntary entrustment agreement, and the juvenile court adjudicated him dependent on February 13, 2013. I.N. was initially placed with his current foster parents, T.T. ("Foster Father") and C.T. ("Foster Mother") (collectively "Foster Parents"), but due to Foster Mother's illness, the child was moved temporarily, before returning to Foster Parents' care during July 2014. Foster Parents are potential permanent placement resources.[4]

The initial permanency goal was reunification. The juvenile court ordered Father to utilize several services, including sex offender counseling, couples counseling and individual therapy. He was also ordered to submit to random drug screens and maintain visitation with his son.

Father's compliance with the court ordered goals and services was minimal. While he completed couples counseling with Mother and enrolled in sex offender counseling, he failed to comply with the individual counseling

---

[4] As I.N. has indicated that he disfavors adoption, and since he is approaching an age where his consent to adoption is required, CYS developed a concurrent goal of permanent legal custodianship rather than adoption. N.T., 7/31/14, at 48-49.

requirement. Moreover, citing financial limitations and a lack of transportation, Father stopped attending sex offender counseling. However, he subsequently revealed that he disliked being required to interact with other sex offenders during group therapy.

As it relates to the requirement for random drug tests, CYS attempted three drug screens. Father submitted one positive sample, one negative sample, and immediately before his October 2013 arrest, he simply refused to participate. During the evidentiary hearing, Father proclaimed that he would have passed the final screen but, since Mother had just submitted a positive sample, he declined the test in order to avoid embarrassing her.

Prior to his October 2013 incarceration, Father exercised supervised visitation for one hour on alternating Tuesdays. The visitations occurred at a local park or in a nearby fast food restaurant. Father attended approximately one-half of the thirty-six supervised visitations scheduled prior to his arrest. Following his arrest, Father did not resume visitations with I.N. until March 2014, roughly five months later. Those bi-weekly contacts at the Northumberland County Prison were limited to one-half hour.

On April 10, 2014, approximately one month after Father restarted the visitations, CYS filed a petition to terminate Father's parental rights to I.N., pursuant to § 2511(a)(1), (2), (5), and (8) and § 2511(b) of the Adoption Act. Following an evidentiary hearing, the orphans' court granted CYS's petition and terminated Father's parental rights. This timely appeal followed. Father complied with Pa.R.A.P. 1925(a)(2)(i) by filing a concise

statement of errors complained of on appeal concomitant with his notice of

appeal. The Rule 1925 statement raised eight issues and sub-issues, which

Father reiterates on appeal as follows:

1. Whether the trial judge erred when involuntarily terminating the parental rights of the Appellant, because the requirements of 23 Pa.C.S.A. [§] 2511 were not met, in that:

1.a. the Appellant/Natural Father did not conduct himself with a settled purpose to relinquish parental claim;

1.b. [t]he minor child was not incapacitated, abused, neglected, nor did the Appellant/Natural Father cause the child to be without essential parental care, control or subsidence necessary for the child's well-being;

1.c. the Appellant/Natural Father was attempting to remedy the conditions which led to placement;

1.d. termination of parental rights does not serve the best needs and welfare of the child; and

1.e. the Appellant/Natural Father had a bond with the minor child, it was beneficial to the child, and severing that bond will cause irreparable harm?

2. Whether the trial judge erred in terminating the parental rights of the Appellant, because the county agency did not make reasonable efforts to make it possible for the minor child to visit with the appellant, and accordingly, the agency did not foster the development of a bond between father and child?

3. Whether the trial judge erred in terminating the parental rights of the Appellant, because the appellant has certain parental rights while incarcerated, and termination of parental rights during the period of time during incarceration would be improper. [T]he Appellant/Natural Father did not conduct himself with a settled purpose to relinquish parental claim, rather he had remedied the conditions which led to placement of the minor child with the agency, in that, he had suitable housing,

maintained employment and was visiting the minor child in order to maintain a bond with his minor child?

Father's brief at 5-6.

Although Father's statement of questions outline several cogent arguments, the argument section of his brief levels one rambling complaint, *i.e.*, that the orphans' court erred in terminating parental rights when he devoted reasonable efforts to overcome the obstacles that prevented him from exercising his parental rights. Highlighting the components of the court-ordered directives and family safety plan that he completed, Father asserts that he utilized all of the resources available to him. Father blames his economic struggles and incarceration for his inability to satisfy the remaining requirements. Additionally, he frames his interaction with CYS as adversarial and complains that the agency regularly attempted to undermine his efforts.

Specifically, Father contends that the agency "paint[ed] him as an abuser" and exploited the allegations of his sexual abuse of I.N.'s half-sister to "thwart the maintenance of a bond" he shared with I.N. **See** Father's brief at 10. The crux of this position is that, since I.N. was not a victim of the alleged sexual abuse, CYS should not have relied upon those allegations as grounds to restrict Father's visitation with I.N. or require Father to complete sex offender counseling. In sum, Father opines that, in light of his accomplishments, justifications for failing to complete all aspects of the court-ordered requirements, and CYS's interference, the record will not

sustain the orphans' court's decision to terminate his parental rights. We address the foregoing arguments collectively, and for the following reasons, we conclude that Father's claims fail.

This Court reviews the determination of the orphans' court for an abuse of discretion. *In re D.C.D.* 105 A.3d 662, 670-671 (Pa. 2014) ("When reviewing a trial court's decision to grant or deny a termination of parental rights petition, an appellate court should apply an abuse of discretion standard, accepting the findings of fact and credibility determinations if they are supported by the record, and reversing only if the trial court made an error of law or abused its discretion."). This is a highly deferential standard and, to the extent that the record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination. *In re A.S.*, 11 A.3d 473, 477 (Pa.Super. 2010). CYS has the burden of proving the statutory grounds for termination by clear and convincing evidence. *In re Adoption of L.J.B.*, 18 A.3d 1098 (Pa. 2011).

Requests to terminate the parental rights of a biological parent are governed by 23 Pa.C.S. § 2511(a) and (b). The statute provides in pertinent part,

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either

- 7 -

has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5)     The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

(8)     The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions

described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

The test for terminating parental rights consists of two parts. In *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007), we explained:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

We need only agree with the orphans' court's decision as to one subsection of 23 Pa.C.S. § 2511(a) and the subsection (b) analysis in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Herein, the certified record supports the orphans' court's determination that CYS established the statutory grounds to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8) and (b). Hence, we do not address the remaining statutory grounds.[5]

---

[5] The orphans' court terminated Father's parental rights pursuant to § 2511(a)(1),(2), (5), and (8); however, the only statutory ground for termination that Father actually challenges in his brief relates to subsection (a)(5). We observe that the elements that CYS had to establish under

*(Footnote Continued Next Page)*

We have explained our review of the evidence pursuant to § 2511(a)(8), as follows:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In Re Adoption of M.E.P.*, 825 A.2d 1266, 1275-1276 (Pa.Super. 2003).

Thus, in order to satisfy the requirements of § 2511(a)(8) in the case at bar, CYS was required to produce clear and convincing evidence that: (1) I.N. has been removed from Father for at least twelve months; (2) the conditions which led to the child's removal continue to exist; and (3) involuntary termination of parental rights would best serve I.N.'s needs and welfare. *See In re Adoption of R.J.S.*, 901 A.2d 502 (Pa.Super. 2006).

Instantly, CYS met its burden of proof. Initially, we observe that, since I.N. was removed from Father's care during January of 2013, the agency satisfied the threshold requirement that the child be removed for at least twelve months. As it relates to the continued existence of the conditions that predicated the removal, the certified record demonstrates

*(Footnote Continued)* _____

(a)(5) align chiefly with the elements of (a)(8), except that the former subsection applies to children that have been removed for six months and requires the agency to establish that the parent cannot remedy the underlying conditions within a reasonable time with the available assistance. That additional element is absent from (a)(8).

that Father's compliance with CYS throughout these proceedings was dismal. Moreover, his excuses and attempts to place the blame for his shortcomings with CYS are unpersuasive.

Our Supreme Court recently held that the agency's reunification effort during the juvenile court proceedings is not relevant to the orphans' court's determination of whether to terminate parental rights pursuant to 23 Pa.C.S. § 2511(a) and (b). *See In re D.C.D.* *supra*. Specifically, the High Court reasoned,

> [W]hile reasonable efforts should be considered and indeed, in the appropriate case, a trial court could insist upon their provision, we hold that nothing in the language or the purpose of Section 6351(f)(9) forbids the granting of a petition to terminate parental rights, under Section 2511, as a consequence of the agency's failure to provide reasonable efforts to a parent.

*Id*. at 675.

Accordingly, we reject Father's contentions that the orphans' court's holding was legal error because CYS failed to provide him reasonable assistance toward reunification. Moreover, the evidence adduced from the certified record belies Father's assertion that CYS undermined his efforts to overcome the obstacles to parenting. Indeed, we soundly reject Father's assertion that the agency painted him as an abuser and fashioned artificial impediments to his relationship with I.N. In reality, the court-ordered sex offender counseling and the requirement that the visitations with I.N. be supervised were warranted in light of the long history of this case. The fact that I.N. was not the victim of any of the sexual assaults that Father

- 11 -

allegedly committed is irrelevant. The court-ordered conditions were necessary to insure I.N.'s continued safety while in Father's presence. Father's obtuse argument to the contrary simply ignores that, as the indicated perpetrator of sexual child abuse and a criminal defendant facing three sex-related felonies, he posed an immediate risk to his adolescent son. As nothing in the certified record supports Father's contention that CYS endeavored to undermine his reunification efforts, this claim fails.

Furthermore, the certified record supports the trial court's findings that Father failed to exercise reasonable firmness to overcome the obstacles of incarceration in order to address the conditions which led to I.N.'s removal. As it relates to the manner that the orphans' court treated Father's incarceration, the Supreme Court's analysis of *In Re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012) is instructive. In *In Re Adoption of S.P.*, the Supreme Court explained, "that incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2)[.]" *Id*. at 828. The High Court further elucidated that, outside of the (a)(2) analysis, a parent's incarceration is relevant when addressing whether he yielded to the impediments of imprisonment or utilized the resources available to him in prison. *Id*. Thus, it is now clear that a parent's imprisonment is relevant and, in certain circumstances that are not involved in this case, may be dispositive.

Herein, the orphans' court considered the effect of Father's

incarceration on his reunification efforts. The court reasoned,

[P]rior to his incarceration, Natural Father was provided with ample time to remedy these conditions and did not avail himself of the opportunity to do so. His visits with [I.N.] were sporadic, and while he began sex offender counseling, he did not successfully complete it. He refused drug testing when offered, stating that he did not want to embarrass the Natural Mother, whose drug test he speculated would not be clean. N.T., Involuntary Termination of Parental Rights, July 31, 2014, at 131, 139-140.

Similarly, relative to subsection (5) and (8) of 23 Pa.C.S.§ 2511(a), Natural Father has not remedied the conditions leading to the removal of [I.N.] from his care and those conditions still exist. Again, the allegations and indicated report of abuse against a half-sibling of [I.N.] mean that Natural Father cannot care for [I.N.] unsupervised, and he is unable to provide an environment that would assure [I.N.'s] safety.

Natural Father is not employed, as he is currently incarcerated; his previous employment was terminated, and he cannot provide [I.N.] with residential or financial stability. *Id.*, at 39. Natural Father did not successfully complete sex offender counseling prior to his incarceration, despite having ample time to do so. In fact, he did not even follow through with attendance at counseling sessions. Since his incarceration, he has made no effort to seek sex offender counseling services in order to continue to work toward this goal, resulting in minimal to no progress.

Further, Natural Father remains incarcerated on pending charges stemming from the allegations of sexual abuse against [I.N.'s] half-sibling, and is thus not likely to remedy these conditions within a reasonable amount of time.

Trial Court Opinion, 9/22/14, at 4-5. The record supports the orphans'

court's determination.

During the evidentiary hearing, Leslee Maturani, the CYS caseworker

assigned to this case since September 2012, summarized the family's

interactions with CYS and outlined the agency's concerns with the effect of drug use in the residence as well as Father's alleged sexual predilections upon the children's safety. N.T., 7/31/14, at 23-25, 26. Additionally, she testified about Father's minimum compliance with the court-ordered services and the safety plan designed to alleviate the removal of I.N. and his sisters from the home. *Id*. at 27.

While CYS made several service referrals on Father's behalf, Ms. Maturani specifically noted Father's failure to complete the court-ordered sex offender counseling. *Id*. at 35-36. She testified that CYS arranged for Father's transportation to counseling, but he attended only intermittently. *Id*. at 36. Similarly, although Ms. Maturani is unsure whether Father ever received any financial assistance from his church, she was aware that the church offered to help Father pay for sex offender counseling. She summarized Father's total effort toward sex offender counseling as (1) enrolling in the program; (2) failing to attend any session for two or three months; (3) briefly resuming participation; and (4) finally terminating any involvement prior to his incarceration. *Id*. at 36-37. At one point, Father informed Ms. Maturani that he did not believe that he belonged with the "creeps" whom he encountered in sex offender counseling, but he subsequently conceded to her that the sessions were appropriate. *Id*. at 37. During that latter conversation with Ms. Maturani, Father implied that he perpetrated the sexual abuse that had been reported and withdrawn in

Union County, but he continued to deny the allegations leveled in Northumberland County. *Id*. 37. Nonetheless, as Ms. Maturani pointed out, Father failed to comply with the counseling requirement prior to incarceration, and there were no programs or services available to him in county jail. *Id*. at 39, 43. In total, Father attended two counseling sessions before being discharged from the sex offender treatment program. *Id*. at 46.

In relation to the remaining counseling components, Ms. Maturani confirmed that Father completed couples counseling sessions with Mother. *Id*. at 38, 47. However, to her knowledge, Father failed to complete individual counseling. *Id*. at 38, 46. Likewise, Father failed to comply with the requirement to maintain stable and appropriate housing. *Id*. at 39. Ms. Maturani explained that the family residence is owned by the paternal grandmother, who resides in Staten Island, New York. *Id*. However, once Mother and Father stopped paying the mortgage on the property, the grandmother could no longer afford to maintain that home as well as her own residence in New York. *Id*. Accordingly, she is preparing to sell it. *Id* at 40.

Similarly, Ms. Maturani delineated Father's cooperation with the random drug screens. As noted *supra*, of the three tests that were requested prior to his incarceration, one was positive, one was ngative, and Father refused to comply with another. *Id*. at 38, 41-42.

As it relates to Father's visitations with I.N., Ms. Maturani stated that, prior to Father's arrest and incarceration for the sexual assault of I.N.'s half-sibling, Father attended fifteen of thirty-six bi-weekly vitiations. *Id*. at 30-31. She supervised most of the one-hour visitations. She reiterated that Father's excuse for missing the visitations was that his work schedule interfered with his ability to attend the visitations. *Id*. at 31. Although Ms. Maturani suggested that Father alter the visitation schedule to suit his employment obligations, he never changed it prior to his incarceration. *Id*. at 32. She continued that, following Father's arrest and incarceration in the county jail, he waited five months before resuming visitations with I.N. at the county facility.

As to the nature of the visitations that Father attended prior to incarceration, Ms. Maturani testified as follows. Father became angry during several of the visitations due to his child support obligation or the child's appearance, and he made inappropriate comments in the child's presence. *Id*. at 33. Sometimes, Father would become so agitated with Ms. Maturani or the agency that it affected his interaction with I.N. *Id*. at 51. Father's outbursts made then-nine-year-old I.N. anxious. *Id*. at 33. Nevertheless, the child would attempt to calm Father and continue the visitations. *Id*. During one episode, Father completely disregarded I.N.'s attempts and terminated the visitation prematurely notwithstanding the child's efforts to quell Father's anger. *Id*. at 49-50. On another occasion,

Father engaged in an extended rant in front of I.N. about the then-pending criminal investigation of the sexual assault allegations. *Id*. at 50. Again, I.N. was obliged to calm Father in order to preserve the visitation. *Id*. Ms. Maturani noted, however, that once the visitations were conducted in the county jail, Father's behavior improved and his interactions with I.N. became appropriate. *Id*. at 33, 51.

On October 9, 2013, approximately one week before his incarceration, Ms. Maturani mailed Father a pamphlet regarding the implications of the Adoption and Safe Families Act on I.N.'s dependency and a letter advising him that his continued non-compliance would be an impediment to reunification. *Id*. at 57-58. She stressed that Father had to maintain contact with the agency and fulfill its referrals to outside providers in order to continue to receive services from the agency. *Id*. at 58. Father failed to respond. *Id*.

In sum, Ms. Maturani posited that Father is not a placement option for I.N. and no definitive date exists when Father could be considered a viable placement resource. *Id*. at 40. She explained that, since Father is awaiting trial for the sex offenses that he allegedly perpetrated against I.N.'s half-sister, his life is unsettled. *Id*. at 40. Similarly, Father's preferred placement alternative, the paternal grandmother, is not a viable option. Ms. Maturani testified that the agency first considered paternal grandmother as a potential placement resource in late-November 2012, but, the grandmother

remains hesitant to assume the responsibility due to financial concerns. *Id*. at 152. Moreover, although Ms. Maturani assisted the paternal grandmother with the clearance process during the end of 2012, as of the date of the termination hearing, July 31, 2014, the grandmother failed to complete the necessary out-of-state documentation. *Id*. at 44, 152-153, 154. Accordingly, CYS has not continued to pursue the grandmother as a placement resource. *Id*. at 154.

CYS also presented the testimony of Susan Shock, who provided temporary foster care for I.N. during the nine-month period that Foster Mother recovered from her illness. Ms. Shock testified that I.N. assimilated smoothly into her family. *Id*. at 82. She stated that, even though Father had been given their address when I.N. was placed in her and her husband's care, Father never called their home or corresponded to inquire about his son. *Id*. at 80-81, 83. As it relates to visitations, since Ms. Shock cared for I.N. during the five-month period that Father failed to participate in visiting his son, her knowledge of the visitations is limited. *Id*. at 84. She did testify, however, that I.N. was excited when Father resumed the visitations during March of 2014. *Id*. at 85.

Next, Foster Mother, who is the prospective placement resource, testified about her limited interactions with Father. She stated that she only encountered Father during few of the visitations, and she indicated that, throughout the time that I.N. was in her care, Father did not contact her or

her husband personally to check on I.N. *Id*. at 93. However, Father would occasionally communicate with I.N when the paternal grandmother called the foster home. *Id*. at 94. As it relates to Father's behavior during visitations, Foster Mother testified that, even though she did not attend many of the visitations, she observed one of the outbursts that Ms. Maturani described. *Id*. at 106. She also noted that I.N. recovered quickly from the disappointment associated with the frequent visitations that Father missed. *Id*.

The foregoing evidence sustains the orphans' court's conclusion that CYS established by clear and convincing evidence that the conditions that led to I.N.'s removal continued to exist and that terminating Father's parental rights would best serve I.N.'s needs and welfare. First, the record bears out that Father failed to comply with the court-ordered directives, including the requirement that he confront the issue regarding his status as sex offender. Hence, the conditions which led to I.N.'s removal continue to exist. Moreover, Father has not demonstrated any ability to provide I.N. permanence, stability, and safety or assume parenting responsibilities within the foreseeable future. He is awaiting trial for sexually assaulting a minor, unable to preserve the family home, and only maintains contact with I.N. during the half-hour supervised visitations at the jail Accordingly, CYS established all three components of § 2511(a)(8).

Having found that the orphans' court did not err in finding that CYS

satisfied its burden of proving the statutory grounds for terminating Father's parental rights pursuant to § 2511(a)(8), we next review the orphans' court's independent needs and welfare analysis under section 2511(b). Pursuant to the Adoption Act, the court's primary consideration is focused upon the child's "developmental, physical, and emotional needs and welfare[.]" 23 Pa.C.S. § 2511(b). Additionally, even though the statute does not mandate that the orphans' court consider the effect of permanently severing parental bonds, our case law requires that consideration where, as here, a parent-child bond exists to some degree. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993).

The extent of the trial court's bond-effect analysis depends upon the circumstances of a particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa.Super. 2008). We have emphasized that, while a parent's emotional bond with his child is a major aspect of the § 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the trial court when determining what is in the best interest of the child. *In re K.K.R.-S.*, 958 A.2d 529, 535-536 (Pa.Super. 2008). Neither precedent nor statute requires an orphans' court to order a formal bonding evaluation by an expert. *Id*. at 533. Indeed, the mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa.Super. 2008) (trial court's decision to terminate parental rights was

affirmed where court balanced strong emotional bond against parents' inability to serve needs of child).

As we explained in *In re K.Z.S.*, *supra* at 763 (emphasis omitted),

In addition to a bond examination, the court may equally emphasize the safety needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

*See also In re A.S.*, 11 A.3d 473, 483 (Pa.Super. 2010) (orphans' court can emphasize safety needs, consider intangibles, such as love, comfort, security, and stability child might have with the foster parent, and importance of continuity of existing relationships).

Instantly, the orphans' court's needs and welfare analysis was as follows:

The Court also examined the existence and quality of the bond between Natural Father and [I.N.] and found that, while a bond does exist, that bond is not a beneficial one for the child. The Court state[d at the conclusion of the evidentiary hearing]:

I believe that your son has some bond with you. However, I don't believe that's a positive thing. You have only brought instability into his life because of your actions. The bond that he does have with you has not helped him. It has hindered him and caused him problems... He needs stability in his life and that you cannot provide that to him now and quite possibly will not be able to provide that for some time... I think he will be

- 21 -

> somewhat sad about not having you in his life for a while, but I think that he will adjust to that positively.

Trial Court Opinion at 5 (internal citation to the record omitted).

The record sustains the trial court's findings that terminating Father's parental rights best serves I.N.'s developmental, physical, and emotional needs and welfare. Ms. Maturani testified during the hearing that I.N enjoys the time he spends with Father but is very anxious prior to the visitation, particularly about his appearance and whether he is late. N.T., 7/31/14, at 33, 35, 42. She further elucidated that, while I.N. does not talk to her about his visitations with Father at the county jail, she observed that he was intimidated by the facility. *Id*. at 35. She recalled, "the first visit at the prison he -- it's intimidating walking in there as an adult, I can't imagine what it's like walking in there as a ten year old child. He held onto me walking through the . . . prison." *Id*. She further explained that I.N. never indicated a desire to reside with Father nor did he express an interest in expanding his relationship with Father beyond the visitations. *Id*. at 48. In contrast, he cried following visitations with Mother, and questioned why he could not return home with her. *Id*. at 34.

Ms. Maturani also testified that I.N. was excited about returning to Foster Parents' home and noted that he "loved being there." *Id*. at 35. She elucidated that, while Foster Parents are a prospective placement resource, they have not formally offered to adopt I.N. *Id*. at 45. The family discussed adoption prior to Foster Mother's illness, but at that time, CYS and Foster

Parents agreed to continue with the *status quo* while I.N. was in their home.[6] *Id*.

Foster Mother's testimony during the evidentiary hearing also supports the orphans' court's decision to terminate Father's parental rights. She reiterated that I.N. was anxious prior to his visitations with Father. *Id* at 91, 97, 101. Specifically, he worried about the time and his personal appearance, and asked nervous questions concerning the agenda during the visitation. *Id*. at 91, 101. The child did not discuss his interactions with Father unless he was asked specific questions. *Id*. at 90. Similarly, Foster Mother stated that I.N. was quiet and withdrawn following the visitations. *Id*. at 91, 101. However, once he was home for a while, he would open up and play with his foster siblings. *Id*. at 102.

Additionally, relative to the intangibles we identified in *In re K.Z.S.*, *supra* at 763, "such as the love, comfort, security, and stability the child might have with the foster parent," Foster Mother stated that she has four birth children with whom I.N. enjoys a close relationship. She noted that the children missed each other while I.N. was away from the family and that the bond among the children is now closer than ever. N.T., 7/31/14, at 89. She

_____

[6] We note that Foster Parents' indecision regarding formal adoption is consistent with CYS's decision to pursue legal custodianship, in lieu of adoption, as a concurrent placement goal.

opined, "I think they didn't realize how much they missed each other[.]" *Id*. at 89-90.

In relation to I.N.'s daily interactions, Foster Mother testified that the child is well adjusted and an excellent student. *Id*. at 92. He and one of Foster Mother's birth children currently attend the school where Foster Mother works, and both will remain in that school following her anticipated transfer to another building. *Id*. at 92. I.N. refers to Foster Mother as either Christy, mom, or Miss Christy. *Id*. at 89. However, when I.N. is being playful, he calls her "sweet cakes." *Id*. at 90. Foster Mother further observed that I.N. was thriving within the structure of the foster home. *Id*. at 95. She believed that stability and permanency is an important aspect of I.N.'s continued development, and noted that I.N. responded well to family settings. *Id*. She detailed that he is often the first person to the dinner table and relishes being part of the family. *Id*. She stressed that I.N. values the relationships that he formed within the family, including his foster grandparents, whom he identifies as "Mem and Pap" or "MawMaw and Pa" and seeks out their affection. *Id*.

Additionally, Foster Mother noted a few behavioral issues with I.N. before he was placed with the Shocks but clarified that the outbursts were due to his adverse reaction to information regarding the allegations of sexual

abuse against Father that he overheard during the visitations.[7] *Id*. at 98. She explained that I.N. had difficulty with the offensive themes and opined that the few negative behaviors that she encountered with him during this period were manifestations of his struggle to process what he had heard. *Id*. at 99-100. However, since I.N. has returned to the foster family, she noticed a large difference in his behavior. *Id*. at 100. She recounted that he has been even more loving upon his return and repeatedly exclaims, "I didn't know how well I had it here." *Id*.

As it relates to the effect of terminating Father's parental rights, Foster Mother opined that although she suspected that I.N. would grieve for a period, he would adjust to the loss. *Id*. at 107. She reasoned that I.N. is not suited for his current state of limbo and that he desires finality. For example, Foster Mother shared an exchange that she recently had with I.N., wherein he indicated that he has been in six foster homes during his life, including twice with her. *Id*. at 103. Foster Mother interpreted the comment as I.N.'s recognition that his life lacked permanency. *Id*. She continued that the child's current status with Father clashed with the idyllic setting of stability that has proven to be successful. *Id*. at 104.

The evidence that CYS adduced during the hearing established that

---

[7] While Father also discussed the abuse allegations with Ms. Maturani in his son's presence, the conversation that Foster Mother referenced occurred between I.N.'s half-sisters during a different visitation.

terminating Father's parental rights best served I.N.'s developmental, physical, and emotional needs and welfare. It also demonstrated that the bond I.N. shares with Father is superficial. Although I.N. enjoys interacting with Father during visitations, he never expressed any desire to live with Father or to expand their relationship beyond the scheduled visitations. In fact, there is little evidence of a shared emotional attachment that reveals the hallmarks of a healthy parent-child relationship. While some emotional bond exists between father and son, it is characterized by uncertainty, anxiety, and nervousness.

Additionally, nothing in the certified record validates Father's ability to satisfy the child's basic requirements for security or addresses his developmental needs. The record not only demonstrates that I.N. desires a stable, permanent family, which Father is utterly incapable of providing, it also reveals that I.N.'s personality is not suited for the instability associated with Father's criminal conduct and incapacity to address his parental deficiencies. Stated simply, Father cannot satisfy I.N.'s developmental or physical needs.

Furthermore, unlike the uncertainty surrounding I.N.'s life with Father, Foster Parents provide I.N. a structured family environment that is favorable for his continued development. An excellent student, I.N. is thriving academically and developmentally in the foster home. He has a close relationship with Foster Parents and his four foster siblings, one of which is a

schoolmate. I.N. seeks the adoration of the family members and exhibits affection in return, coining pet names for Foster Mother and the foster grandparents. The child clearly enjoys being a part of the family. He expressed gratitude upon his homecoming and emphasized that he missed the family members during his absence. Observing that a child's emotional attachment with his foster parents is a significant factor in evaluating his developmental and emotional needs and welfare, and mindful of the intangible factors that we outlined in *In re K.Z.S.*, such as the importance of continuing beneficial relationships, we find that sufficient evidence exists in this case to sustain the orphans' court's determination. Terminating Father's parental rights best fulfills I.N.'s emotional needs and welfare.

Oder affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/27/2015